Submitted on briefs July 2, reversed September 17, 1958

## HOUSLEY *v.* HOUSLEY

329 P. 2d 668

Francis F. Yunker, Portland, for appellant.
George G. Van Natta, St. Helens, for respondent.

O'CONNELL, J.

This is a suit to set aside a conveyance made by the plaintiff, Katie Mae Housley, to the defendant. The complaint is based on the theory that plaintiff was induced to convey property owned by her to the defendant, James Walter Housley, as a result of fraudulent representations made by James A. Housley,

the plaintiff's husband and the defendant's son. The plaintiff alleges that her husband falsely represented to her that he was in trouble with another woman; that this other woman was making heavy financial demands upon him; that the family ownership of valuable property contributed to his difficulties in attempting to make a settlement of such claims; that unless the property was conveyed it would be lost and that if conveyed by her to the defendant it would be reconveyed after the claims against her husband had been disposed of. The plaintiff alleges that at the time these representations were made her husband had the intention of bringing about a divorce between himself and the plaintiff and that in order to deprive her of her marital rights in the property he induced her to make the conveyance to the defendant.

The property in question was owned by James A. Housley prior to his marriage to the plaintiff on May 4, 1956. On May 18, 1956 he conveyed the property to the plaintiff under the following circumstances: Prior to James A. Housley's marriage to the plaintiff he had associated with a woman whom we shall designate as Bessie. Bessie was pregnant, and there was gossip in the community that James was responsible for her condition. The plaintiff knew of this gossip at the time she married James. She also knew that Bessie had been James' housekeeper. She testified that James told her before their marriage that he was not responsible for Bessie's pregnancy. According to plaintiff's testimony James represented to her that there was a possibility that Bessie might have a claim against him and that Bessie would probably bring a suit against him and try to get the property in question, and for this reason James conveyed the property to the plaintiff. On June 13, 1956 the plaintiff joined with her

husband in a conveyance to the defendant which she thought was for the same purpose as the conveyance from James to her, that is, as she put it, "to keep this other party from getting it."

The plaintiff alleges that the representations made to her by her husband were false. She contends that financial demands were not being made on her husband by Bessie; that no basis for heavy financial demands existed, and that her husband did not contemplate making any settlement with Bessie. On the contrary, she asserts that Bessie and James were friendly and intimate at the time of these representations.

Plaintiff's evidence in support of the alleged fraud upon her is meager. She called no witnesses. Her case rests upon the following testimony: She testified that in June her husband denied that he was responsible for Bessie's pregnancy; that a month later, sometime in July, she had a further conversation with him and that he admitted that he was responsible but that he was all through with Bessie; that about the time she signed the deed conveying the property to the defendant she had a conversation with Bessie and that Bessie said that plaintiff's husband liked her and not the plaintiff and that plaintiff should ask her husband if this were not true. The plaintiff then told her husband of this conversation. She told him that he had a choice between Bessie and herself and that he chose Bessie. Katie Mae testified that in the conversation with Bessie the latter told plaintiff that her husband had "deeded the property over for his father." According to plaintiff's testimony she attempted to become reconciled with her husband after she had filed a suit for divorce but he was not interested in a reconciliation. She stated that she protested against his association with Bessie but that "He usually tells

me it is none of my damn business." On cross-examination when asked, "What do you know about him carrying on with Bessie * * * in any respect or going out with her?", plaintiff replied, "Well, I know he has."; "I see him with her."; "He saw her more than once."

The evidence offered in rebuttal of the plaintiff's claim that her husband had fraudulently induced her to enter into the conveyances of the property in question was based entirely upon his testimony. He testified that at the time he married the plaintiff a claim was made against him by reason of the paternity proceedings brought by Bessie; that these proceedings were filed in the Circuit Court for Columbia County; that as a result of such proceedings he made arrangements to pay Bessie "support" money; and that he had been paying her $40 each month. He denied that he had promised his wife not to see Bessie and stated, upon cross-examination, that "he had to see her", but he was not asked why it was necessary. However, he denied that he had gone back to Bessie and he asserted that he told his wife that he had "given up" Bessie. On cross-examination he admitted that he had employed an attorney to draw the two deeds involved in this case; that he stated to the attorney that he wanted the deeds made because he owed his father, the defendant, money for materials and labor in connection with the construction of the house on the property involved in this suit. He admitted that he told his attorney about Bessie, but when asked on cross-examination, "Was she involved in this picture at all, about these transfers?", he answered, "No." He stated that he did not know that he had signed a deed conveying the property to his wife until his father's attorney showed him, after plaintiff had brought this suit against his father, that he had done

so. There is no further testimony, either on cross-examination or redirect to explain why James A. Housley did not know that he had conveyed the property to Katie Mae in the first instance. He denied that he had told Bessie that he preferred her to Katie Mae; he denied that he had been going around with Bessie, and described the accusation as "ridiculous", and said that he had nothing to do with her except to pay her $40 a month. When asked why he did not become reconciled with his wife he responded, "If she has cost me money in lawyers fees and sued my people and I come back, it would all come up again. No."

After this testimony was given the plaintiff was recalled and was asked if she had seen her husband and Bessie together at any time since July 1. She stated that Bessie and her husband were at his brother's house when his brother was not at home. She did not remember the date. The only other testimony of consequence was the plaintiff's testimony concerning money advanced by her to her husband. She stated that her husband had asked her for an "advance" and that she let him have $500 "to try to buy her [Bessie] off once"; that soon after the deed was signed he returned the $500 to her.

This is a fair summary of all of the significant testimony in the case. Neither the plaintiff nor defendant put on any witnesses to corroborate or refute the testimony given. Except in a few instances the testimony concerning the relationship between Bessie and the plaintiff's husband was not keyed to any particular time and consequently it is impossible to determine whether the alleged meretricious intercourse with Bessie took place before or after the conveyances in question were made.

The plaintiff's case must stand or fall on the theory that her husband had a design to defraud her by the transfers of property involved in this case. At best the evidence in support of her claim is a thin structure built upon inferences which have not been carefully put together in the trial of the case. Out of the scant and conflicting testimony the plaintiff asks us to find that her husband was unfaithful to her; that this infidelity existed within two weeks after their marriage; that at this early period in their married life he had already made plans to bring about a divorce between himself and the plaintiff and that the conveyance to her and the conveyance to his father were designed to defeat her claim when the divorce action was brought. This is not an impossible interpretation, but there are weaknesses in it. If plaitiff's husband wished to defeat her prospective interest, why did he convey the property to her in the first instance? Why did he not obtain her signature on a deed by which the property was conveyed directly to the defendant? The plaintiff's counsel suggests that he may have conveyed the property to her "gambling that that very act would help convince her that she should join in the deal intended to strip her of any claim to the homestead * * *." We think that this interpretation of the case attributes to James A. Housley a cleverness which he is probably not entitled to claim. Moreover, having in mind that the initial conveyance was made two weeks after the plaintiff's marriage to James A. Housley, it is difficult for us to believe that Housley had already decided to separate from his wife and to deprive her of any interest in the property. It is possible, of course, that the plaintiff's husband formed his intent to defraud her after he had conveyed the property to her. Even assuming this

to be true, the conveyance from the plaintiff to the defendant was only about one month after the plaintiff acquired the title from her husband. It is as likely that both conveyances were made as a part of the same plan.

We are of the opinion that the plaintiff has not established that the conveyances in this case arose out of James A. Housley's intent to defraud her. She has the burden of proof. We believe that the plaintiff's evidence is not strong enough to preponderate. It appears to us that when all the circumstances are taken together they point as convincingly to an attempted fraud on Bessie as they do on the plaintiff. The fact that the conveyances were made so soon after the plaintiff's marriage to James A. Housley seems significant to us. There was a question as to the paternity of Bessie's child and she had actually brought paternity proceedings. This fits in with Housley's contention that he was being pressed by Bessie to settle with her. He paid her $40. This may have been done without any threat of suit by Bessie, but again, it seems more likely that it was paid because a claim was made against him. Housley borrowed $500 from Katie Mae "to buy off" Bessie. He may have borrowed the money as a part of his plan of deception. On the other hand it is equally likely that a claim was being made against him by Bessie and that he was trying to buy her off.

We do not think that plaintiff's testimony when weighed against these circumstances constitutes the preponderance of evidence which she must produce to win her case. See *Goldberg v. Goldberg,* 295 Mich 380, 295 NW 194 (1940); *Russell v. Russell,* 130 Kan 40, 285 P 633 (1930); *Wright v. Nelson,* 125 Colo 217, 242 P2d 243 (1952).

The record discloses that the plaintiff had brought a suit for divorce against James A. Housley prior to the institution of the present suit. Whether she has a right in the divorce proceeding or in any other proceeding to reach the property sought to be recovered here is a question which cannot be decided in this suit. The decree is reversed.

Mr. Justice McALLISTER concurs in the result of this opinion.